173087 United States of America v. Talman Harris, arguments not to exceed 15 minutes per side. Mr. Kushner for the appellant. Thank you. Good morning, your honors. I'm Phil Kushner on behalf of Talman Harris. And if it pleases the court, the issue I would like to address first is the obstruction of justice conviction, which was count five. There, the evidence submitted by the government was a single witness, Mr. Durand, whose uncorroborated testimony was that Mr. Harris told him to lie to the FBI. In cross-examination, Mr. Harris's counsel. Counsel, I'm going to cut to the chase on this one, if I may, and just ask you, you raise two points in your brief on this. You raise refreshing the recollection and prior inconsistent statement, correct? In my mind, at least, clearly the district court erred in both grounds, OK? You can refresh your recollection with anything, and you can impeach with a prior inconsistent statement. I don't know. I think she mistakenly thought that it had to be sworn. The government responds in their brief that they take a new tact, which is this wasn't authenticated, because it was on the cell phone. So I guess I have two questions. I'm sorry to do this to you. One is, just so I understand, and I'm sorry if I miss this, the statement on the cell phone is the investigator and the witness talking, correct? Yes. So what it is is not actually a phone call, but a recording of their conversation. Correct. OK. And the second is, can you address the government's authentication? I know in your reply, you say this didn't, did it not come up at all below? No. OK. And, in my view, defense counsel did what he is required to do under the rules, is he made a proffer under. Was that in the record? Yes, Your Honor. That's exactly what was on the tape. Yes, he described exactly what was on the tape, quoting the language that was on the tape. Was it put on the record, not from him, but from somebody else? Yes, it was on the record. It's in the transcript. So I'm looking at page, do you have the record with you? I'm looking at page 935. And he said, isn't it a fact, Mr. Dwyer asked, and then he quotes, was Talman basically saying, if anybody comes around, just tell the truth and leave it at that. And you said it was more in that nature you know. Didn't you say that? And he said, I don't remember. And then Mr. Keller says, I have a tape recording of this. I guess to follow up on Judge Seiler's question, you're saying basically that that's sufficient, where he asked the question and then says, look, I have a tape recording of this. He doesn't have to say exactly what's on the tape recording. Yeah, I think it satisfies the requirements for a proffer. OK. Yes. So I think, I'm sorry. How's a trial court going to know what's on there if you don't put it in the record? I think he told her. He told her from the question and then the description of what it was he wanted to do. Right after he got the answer to the question from the witness where he said, didn't you say to my investigator X, he approaches the judge and says, I have a recording where he says X, which I'd like to use now. And I think that satisfies the requirements for proffer under 103.82. And nobody suggested anything about an obligation to authenticate. And if I may, can you imagine what it would do to trials if after a judge had excluded evidence, you then had some procedure where you had to continue to go through and lay foundations for evidence? It's not the law, and you can see why. It would be wildly unwieldy. I think it would irritate a trial judge, having both of us having been there. I think it's unfair to ask defense attorneys to do that. Let me turn to the harmless error, because the final point they make is that this is harmless. And if I missed one, they'll correct me. But go ahead and respond to that. Well, this was the sole evidence of obstruction of justice. It was the testimony of Mr. Durand. And there was no corroboration for his testimony. There was no document corroborating his testimony. So he said Harris told him to lie in court, outside of court. He said Harris told him to tell the truth. I don't think the government can meet its burden of showing that it was And the cumulative evidence doesn't apply, because this is an individual count of obstruction of justice. And so you just look at the evidence relating to the count. Because if you notice in their brief, they say the evidence, I think it's the evidence from the entire trial was, I don't remember. I think your honor is correct. That's how they put it. OK. Do you want to move on to the Remmer hearing? Yes, I would, your honor. OK, thank you. And there, after the verdict, the defense came forward with credible allegations of juror misconduct, filed a motion. What's the standard? Because I read Remmer. What should be the standard by which a trial court reviews the evidence? To make a determination as to a hearing, not as to discovery. And I want to know if you think they should be different. Yeah. First, I think, and I relied upon this court's language in Corrado, I think a credible allegation is sufficient. I think that once there's been a credible allegation, the court has to do something. The court has discretion about what to do to investigate the allegation. And for example, here, a logical first step might have been to get the transcript prepared from the voir dire, which would have let everybody know. Because no one knew this. Did you ask for that? No. No. The request that was made by Harris's counsel was, we'd like a hearing so the court can conduct an investigation. Did they also ask for discovery? No. It was, or in the alternative, if the court isn't going to grant a hearing, give us permission to investigate. And the court just denied it entirely. And what should the standard be to give you permission to investigate? Should it be lower than the credible evidence theory you've put forward? Yes. It should be. OK. And then let me give you the 11 circuits theory, standard in Barshov, and ask you why this shouldn't be the standard and how you could satisfy it. The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence, not evidence, extrinsic influence, to overcome the presumption of jury impartiality. Whereas here, what you have, and I want you to walk us through it because I'm not sure I fully grasp it. But what you have is a LinkedIn contact that by my reading could have occurred after the trial was over. I don't think that is right. And I would like to walk you through why that is not right. OK. And the key document there is exhibit C to the Remmer motion, which is document 233-3. Can you tell me which one that is? Yeah. Exhibit, would a page ID help? Just tell me what it is. It's the LinkedIn screenshot. It's the screenshot like that. Exactly, Your Honor. And there's two places where it tells you what time period it's reporting the viewers. Can I go back? OK, so I'm looking at, I guess that's exhibit C. I'm looking at exhibit A, which is this LinkedIn document. And it says, Talman, see what your network has been up to. And it says you have three notifications. OK, and this is September 6, right? Two profile views and one new update. Now, you should assume I know very little about LinkedIn. But then it says three LinkedIn members viewed your profile in private mode. And then it says Christian Galeno, who's the person in question, viewed it a week ago, right? Are you looking at the LinkedIn screenshot now? Yeah, now I'm looking at the screenshot. So explain this to me. Because if it says three people viewed during this time period, then why would Christian Galeno be during the trial time period versus why couldn't she be in the week after? Well, he's getting notified that there are people in private who've looked at his LinkedIn page. And by the way, this occurred on the day of the verdict. The trial. What occurred on the day of the verdict? He saw that he was being notified by LinkedIn that someone he didn't know from Youngstown, and there was no publicity for this trial, had gone and checked his LinkedIn page. And he then went and looked at the LinkedIn screenshot, which said, this person looked at your LinkedIn page during the trial. And he went to her Facebook page and saw pictures of her and one of the jurors. And the pictures, if I may, it's not. I think that's right. Did you have a question? I do, because are you looking now at Exhibit A or Exhibit C? C, Your Honor. OK, but C is from September 12th, is it not? Yes. I think that's right. In the lower left, that's the date that appears there. And then what it has is the ability to see who are the people who looked at your LinkedIn during particular time periods. There's a filter. But to Judge White's point, this says a week ago. Does that mean the last week, or does it mean exactly a week ago? And if it's exactly a week ago, it's the fifth, which I guess your argument would be the verdict came back on the sixth, right, or the seventh. It was still during the trial, even if it was a week prior to the 12th. But does a week ago mean exactly a week ago, or does it mean in the previous week? I think it means during the previous week, which is the thing that is being. So why couldn't it be on the eighth then? Because the, I mean, there's two places on C where it's indicating the time period that she looked at it. One is the, what's the word I'm looking for, filter, which is on the upper left. And then if you look on the upper right, is also a highlight area where it's showing you the period of time that it's showing when someone looked. You're saying viewers week of August 28 to September 3 tells you the time frame, but that week would be more than a week ago from the 12th. Yeah. I think the way I would think of it is, first, a week ago, it's from the week that includes the 12th. They're organized by weeks. And in that way, the two pieces of data correspond. OK. Your time's up. Do you have another question? I have a question. Is there a local rule which precludes parties from contacting jurors after the verdict or contacting someone else? Because you asked permission to investigate. Why couldn't you at least investigate Galena? Because she's not, better name, Galena. Christian Galena. Yeah. Why they couldn't have questioned her and put it on the record? There is no local rule that would have barred them from contacting her. The motion that was filed with the court recited, this is a sensitive area, juror misconduct. We would like this to be occurring under the court's control. That would be our preference. And I can understand why a lawyer would feel that way. You don't want to be accused of harassing jurors or anything. And I think they did the right thing to ask in the first instance for it to be under the court's control and say, but if the court isn't prepared to do that, please let us do it. And once I've made that request to a district court judge, I would not feel comfortable doing anything until the court had ruled. But you could have. It's not against the court rules. It would not be against the rules. Not unethical. No. Thank you, counsel. Go ahead, Judge White. I'm sorry. That's OK. I just want to confirm that the only evidence that you presented is that the girlfriend looked him up on LinkedIn and that there's no negative information on LinkedIn. But from that, you inferred that she went further and did more research and found negative information. Actually, I would put it differently, Your Honor. Our view is she did internet research on Mr. Harris. You do internet research by doing a Google search. In fact, during the trial, when another issue came up with regard to a juror, the court did a Google search in order to do internet research. That is how one does internet research. And if one does a Google search, yes, a LinkedIn page will come up. But also in this case, articles with prejudicial information concerning the defendant, which the court had barred from trial, come up right at the very top. The only time that people do a LinkedIn search is if they're looking for a job or they're trying to determine something about a colleague. If you're doing research regarding a person in today's era, you do a Google search. So that's our theory. OK, thank you, counsel. May it please the court, my name is Dan Ranke. I represent the government on this appeal. For the Remmer hearing, in order to get a hearing, Mr. Harris would have had to present a colorable claim of extraneous influence. So he presented evidence that the girlfriend of one of the jurors did a Google search or a search and found this and checked the LinkedIn page. Obviously, human nature is such that if you saw some of the other things, you might look at them. Why doesn't a district court, at a bare minimum, have an obligation to protect the sanctity of the verdict and do at least allow defense counsel the opportunity to reach out and interview this person? Because it really didn't show enough, Your Honor. It didn't show internet research. What else could they have done? They're not asking for a full-blown Remmer hearing. They're asking for a hearing or, in the alternative, the opportunity to investigate. I think they would have needed to show some type of unauthorized contact between juror number 12 and Galeno, which they didn't show. They live together. They're allowed to live together. But they live together, and she's researching the defendant. Arguably after trial. Maybe, but they've made a good case that this happened during trial. Look, the district court could have cleared this up in 10 minutes. They could have let them investigate, or they could have called juror 12 in and simply asked. But they didn't do either. And I mean, it looks bad. I mean, I'm looking at it and thinking, jeez, it looks bad. And this is a criminal trial. Someone's liberty's at stake. If they had shown more, they just didn't really show enough. They didn't show that juror number 12 looked at the LinkedIn page. How are they going to do that without an opportunity to investigate? They've gone to the court and said, this is what we have, Judge. Can we have permission to reach out and contact? Can we have permission to do something? Tell me how they do it without, this is what they've got. They don't have anything else. Well, they could have gone and talked to Galeno. Once they, look, I agree that sometimes it's better to ask for permission than forgiveness. As a former district judge, it's much, or forgiveness than permission, as a former district judge, it's much better to ask for permission. They went in. They asked the district judge for permission. The district judge said no. Now they can't do it. To me, if defense counsel were running around and doing these things, I know my colleagues in the Eastern District of Kentucky would go crazy. But all there is here really is speculation, nothing else. No, it's speculation when you come to the court and say, we don't have anything. But here's what we think. Here they brought something to the court. All they showed was that Galeno looked at the LinkedIn page, arguably sometime around trial, at the end of trial or after trial. It would have been improper if the juror had done that, right? Absolutely. So he's got somebody who's his paramour, live-in girlfriend, and she does it. There's no way to explain why she would have done it, right? Otherwise. The judge kind of, Judge Pearson somewhat addressed that in that just in this age, it's not unlikely that she looked. You know, it's Youngstown Federal Court. There's only one federal judge. It wouldn't be that hard to look on their website, see which trial's in progress, and look up the facts. But it's just as likely, if not more likely, that she asked him a question and he said, oh, I'm sitting on a jury trial. The guy's name's Talman Harris. And then her intuition kicked in, and she went and Googled it. Well, Judge Pearson found that was not. Actually, she made the opposite conclusion, that it was just as likely or more likely that she just did this independently. What should the standard be? What should the standard for discovery be when the defense comes forward with credible or somewhat credible evidence that someone potentially spoke, violated a direct order of the court? I think when you look at the cases, you mentioned Barshaw, there has to be an actual communication. So I'm showing that there's a communication between, there has to be some indication that there's a communication between Galeno and juror number 12. And there just wasn't. All you had was juror number 12 looking at a LinkedIn page sometime within a week of September 12. The exhibits really don't show anything else. Exhibit A doesn't really show anything to do with Galeno. Exhibit B just shows when Harris looked at his LinkedIn page. And exhibit C shows that Galeno looked at it within one week of September 12. That's the way I read that exhibit C. The other exhibits are just their Facebook pages and show their relationship. But there's still no indication that Galeno ever talked to juror number 12 about this case. And that's what the court relied on. And I think that's what, in the cases where there's been Bremer hearings, Barshaw, we cited a couple other cases, Caldwell and Muhammad, there was actually communication between the juror and someone else. And I think that's what you need to show. And here, we just came in with this LinkedIn. And just because I looked at LinkedIn, the fact that if you did a Google search, you might come up with Mr. Harris' SEC violations, which is really what the concern is. There's no evidence of that. That's all speculation in and of itself. You could look at LinkedIn without going on Google and going down three or four entries to see an SEC case against Mr. Harris. You could have. You also could have looked at everything. And you could have told your boyfriend about it, and a simple inquiry would have figured that out. But there's no evidence of any of that. I don't understand how they get that evidence without permission to conduct discovery, once they've asked for permission, which, of course, the United States would prefer the defense counsel come to the court and ask for permission before contacting jurors or their paramours, to use Judge Seiler's language. Correct? Correct. OK. What about this statement? Do you have any other questions on this? Judge White, do you have any more questions on the Remmer hearing? No. OK, what about this statement? You agree that it was error for the district court not to allow them to at least refresh his recollection, and or under Federal Rule of Evidence 613B, they clearly, I mean, the district court misunderstood the rules of evidence here. Because they clearly could impeach with this prior inconsistent statement, right? Arguably, yes. Arguably? Should I read the rule to you? No, that's OK, Your Honor. But whose statement is it? I mean, I think the court was looking at, what they're trying to do is use the private investigator statement that the ranch made. No, no, no, his response. It's his response. The private investigator statement was, was Talman, it's a question, was Talman basically saying, if anybody comes around, just tell the truth and leave it at that? It's a question, not even hearsay. And the answer is, it was more in that nature you know. And he says, I don't remember saying that to him. And this whole obstruction of justice, I mean, I agree with the defense. The whole thing comes down to this guy's testimony, right? I think it's Duran. Duran, yes. To Duran's testimony. There's no other evidence of obstruction. It's Duran's testimony. It's the watches. We are going to sell the watches. When in reality, they were taking these kickbacks, right? And this statement was direct impeachment of that he told me to lie. He said he didn't remember it, right? He said he didn't remember making that statement. How else would you put it in? Would you put it in if the person told it to the FBI agent? Say, well, here's what you said, and call the FBI agent. I know this is not an FBI agent, he's a private investigator, but can't you do it that way? Well, the private investigator could have come in and testified to that. All we have is an attorney holding up a cell phone in court for the first time and saying, I've got a recording on this cell phone that purports to be between these two people. But he asked, can I refresh his recollection? You can refresh his recollection with a bowl of linguine, right? Whatever will refresh. That's the rule. And the district court, on this critical, when it comes down to this, why isn't that error? And how is it harmless? There's a little bit more than just Rand saying, it's more of that nature, you know. There's a background to this, too, a factual background, that they gave this same story to the SEC when they were investigated during those proceedings. And the SEC really didn't believe that story either, which is how Mr. Harris' license got suspended. If we find that there is an error in that procedure with Durand, do we send it all back for a new trial? Or did we just say, you'll have to have a new trial on obstruction, but the rest of it is OK? I think it would just affect the obstruction count, for which Mr. Harris received a three-month consecutive sentence to his other four counts. Got three months for the obstruction? Yes. So you just say, well, we'll set that aside and let the rest of it be upheld. Is that what you're saying? I think it would only affect that count. Anything further you want to address, counsel? If the court has no further questions about either the summary charts or the fiduciary duty, then no, I would rest on my brief and ask that this court affirm. Can I ask you one question about the summary charts? Did you have a 902.11 certification on the underlying documents? Is that what you had? I believe we did, Your Honor. I don't have the page ID for that, but I believe we did. OK, and that said they were both authentic and business records kept in the ordinary course? OK. They were clearinghouses that kept the trade records in the course of their business. OK.  I do not. OK, thank you, counsel. Thank you, Your Honor. Do you have a rebuttal? Can you answer Judge Seiler's question that he just asked? Do you agree that if we agree with you on the obstruction count, it just affects the obstruction count? That is what we have asked. Yeah, OK. That's what, three months? Yes, Your Honor. Yeah, and with regard to the Remmer, I just have a couple of points I wanted to pick up on. One, I really think as a practical matter that the defense counsel did everything he could do by submitting to the court all publicly available information. Because no investigation was done, the government argued to the court, there's not even clear evidence that they really know each other. And the court said, well, speculated really about the probabilities of what might have happened on the assumption that maybe they knew each other. It was only, had there been some investigation done, it would have led in the first place to the transcript of the voir dire where the juror said, that's my live-in girlfriend. And then we would, the whole analysis changes. And I think some of your questions, Your Honor, picked up on that. Because you know, when somebody is living with somebody, during, they are communicating every single day. They are seeing them every single day. During the trial, they're seeing them every single day. They're spending more time with them than they're spending in court. Then it takes on a very different quality than if it's just some acquaintance. And that's the problem here, which is if you do nothing, no investigation whatsoever, people are left just speculating and wondering over an issue which is a constitutional issue, the right to a fair trial. That's a serious and important one. You can't do nothing. OK, thank you, counsel. Thank you both for your very thoughtful arguments. We appreciate your time and preparation. The clerk may call the next case.